**BURGER CHEF SYSTEMS, INC., a Corporation, Appellant,**

v.

**Lee J. GOVRO, Appellee.**

**No. 19235.**

United States Court of Appeals Eighth Circuit.

Feb. 25, 1969.

Eugene K. Buckley, of Evans & Dixon, St. Louis, Mo., for appellant.

Mortimer A. Rosecan, of Rosecan & Popkin, St. Louis, Mo., for appellee; Alan E. Popkin, St. Louis, Mo., with him on the brief.

Before VOGEL, LAY and BRIGHT, Circuit Judges.

VOGEL, Circuit Judge.

This appeal is from a judgment of the United States District Court for the Eastern District of Missouri based on a jury verdict of $150,000 to Lee J. Govro, plaintiff-appellee, against Burger Chef Systems, Inc., appellant-defendant, in a suit for money damages by reason of personal injuries. The injuries resulted from plaintiff's being struck, while a pedestrian, by an automobile owned and driven by defendant's agent, Joseph C. Norris, Jr. Federal jurisdiction is based upon diversity of citizenship and the requisite amount in controversy.

The following issues are raised on appeal: (I) whether the District Court erred in failing to sustain defendant's motions for directed verdict and for judgment notwithstanding the verdict on the ground that its agent, as a matter of law, was not acting in the course and scope of his employment at the time of the accident; (II) whether the District Court erred in admitting hearsay evidence in the form of an out-of-court statement attributed to defendant's agent Norris; (III) whether the defendant was prejudiced by the allegedly cumulative erroneous admission of evidence pertaining to the claim of injury which was calculated to arouse passion and prejudice, and by plaintiff's counsel's allegedly inflammatory and prejudicial argument to the jury; and (IV) whether the District Court erred in refusing defendant's requested instruction on the agency issue. We affirm.

■ The substantive law of Missouri is controlling. Elder v. Dixie Greyhound Lines, 8 Cir., 1946, 158 F.2d 200, 202. Because the jury found for plaintiff, we must view the evidence in the light most favorable to him and give him the benefit of such favorable inferences as may reasonably be drawn therefrom. Ahmann v. United Air Lines, Inc., 8 Cir., 1963, 313 F.2d 274, 275–276. The evidence so viewed shows the following facts:

On July 26, 1965, the date of the accident, plaintiff was an employee of the Frontier Life Insurance Company of Jefferson City, Missouri. In the early afternoon he parked his automobile on the south side of Big Bend Boulevard about 300 feet west of South Elm Street in Webster Groves, Missouri. Big Bend runs generally east and west and has a parking lane on each side and one traveling lane for eastbound and another for westbound traffic. Plaintiff got out of his automobile and stood to the rear of it, facing north, waiting for eastbound traffic to pass so that he could cross the

street for the purpose of making a business call. While so standing, plaintiff was struck and pushed into the rear of his automobile by an eastbound automobile owned and operated by Joseph Norris. Plaintiff was seriously and permanently injured.[1]

At the time of the accident, Norris was nineteen years of age and in the general employ of defendant Burger Chef as assistant manager of its restaurant on Watson Road, just east of South Elm Avenue in Webster Groves, Missouri. Norris, as required while on duty, was wearing white trousers and a white shirt with the emblems "Burger Chef" and "Assistant Manager" thereon. Because the manager of the restaurant, Mr. Swann, was away on a business trip that day, Norris, as assistant manager, was in charge of the restaurant's operation. Norris had reported for duty at approximately 5:45 a. m. and had worked continuously from 6:00 a. m. until he left on the fateful trip at approximately 1:30 p. m.

Norris, as assistant manager, was permitted to use his discretion as to when he took a lunch period and how much time he took. Although he was entitled to a free lunch at Burger Chef, he tired of the restaurant's restricted fare of hamburger and fish and once or twice a week would go out for something different, usually chicken. Whenever Norris and Swann were on duty together, one would obtain the chicken, using his own personal automobile, and bring it back to the restaurant for both to eat. Fried chicken was usually obtained at the Kentucky Fried Chicken restaurant located at or near the intersection of Lockwood and Big Bend Boulevard. The Kentucky Fried Chicken place was selected because it was closest to Burger Chef and the chicken was ready for immediate takeout. The reason the chicken was taken back to Burger Chef for consumption was to allow Norris and Swann to interrupt their lunch and help if necessary.

It was part of Norris' duty to obtain money change and merchandise when required for the restaurant's operation. Therefore, because there was a shortage of change right after the noon rush on this day, Norris decided to obtain change at the Crestwood Bank, where the restaurant had an account. Norris' time of leaving was dictated by the need for the change and the fact that the bank closed at 2:00 p. m. Norris had never been directed to use any particular means of transportation to go to the bank and was free to use any method he selected. On the day of the accident Norris used his own automobile for such purpose, as he had done in the past with the knowledge of the manager and for which he was not reimbursed by his employer.

On this day, Norris decided to obtain both the money change and the chicken for his own personal lunch in one combined trip. This would entail his going west on Watson Road to the Crestwood Bank at or near the intersection of Watson Road and Sappington Road, a distance of approximately 1.6 miles; then north on Sappington Road, a distance of approximately one mile; then in an easterly direction on Big Bend Boulevard to Kentucky Fried Chicken at or near the intersection of Big Bend and Lockwood Avenue, a distance of approximately 3.1 miles; then west again to South Elm, a distance of approximately 1.2 miles; and then south on South Elm to Burger Chef for a distance of 1.33 miles. Norris estimated that the combined trip to both places would take approximately 20 to 25 minutes. The distance directly from Burger Chef to Kentucky Fried Chicken is approximately 2.5 miles and directly from Burger Chef to Crestwood Bank, 1.6 miles. On cross-examination, he estimated that if he had made two separate trips—one from Burger Chef to the Crestwood Bank and back with the change and then another trip from Burger Chef to Ken-

1. This appeal raises no question of primary or contributory negligence, although the issue of negligence was considered in the District Court and resolved by the jury in favor of plaintiff.

tucky Fried Chicken—the trips would require a total time of about 18 to 23 minutes. Norris also testified that the two separate trips would require a longer period of time than would one combined trip and that a round trip by automobile between Burger Chef and the Crestwood Bank would take approximately eight minutes.

Following the above routing on the day of the accident, Norris drove west on Watson Road, obtained the change at the Crestwood Bank, drove north on Sappington Road to the intersection with Big Bend, and then turned east on Big Bend toward Kentucky Fried Chicken. The accident occurred on Big Bend a short distance west of the intersection of South Elm and Big Bend.

### I.

It is defendant's position that the evidence shows, as a matter of law, that Norris was on a personal mission at the time of the accident, had materially deviated from his employer's business, and was not performing any act which was of such special direct benefit to his employer as to warrant a jury finding that he was in the course and scope of his employment. Defendant therefore contends that it was entitled to a directed verdict and judgment.

It is plaintiff's position that there was some direct benefit to Burger Chef from Norris' combining going to the bank and picking up his lunch into one trip.

■■ If plaintiff is to recover from Burger Chef it can only be under the doctrine of respondeat superior, whereby a master is liable for his servant's torts committed in the course and scope of his employment. Restatement, Agency, § 219. In Stokes v. Four-States Broadcasters, Mo., 1957, 300 S.W.2d 426, 428, the Supreme Court of Missouri stated:

"No definite rule has been formulated by which it may be determined in every instance whether the driver of an automobile, in the general employment of another, was acting within the scope of his employment, and under the control of his employer, at a given time so as to render his employer liable for his negligence in driving the vehicle. That determination must necessarily depend upon the facts and circumstances of each case."

Whether or not the right of control exists in a particular case is ordinarily a question of fact for the jury. Gardner v. Simmons, Mo., 1963, 370 S.W.2d 359, 361; Benham v. McCoy, Mo., 1948, 213 S.W.2d 914, 919. "Each case must depend upon its own facts and no single test considered alone is conclusive of the ultimate test, the right to control." Gardner v. Simmons, supra, 370 S.W.2d at 361. If the facts and legitimate inferences to be drawn therefrom are in dispute, the issue is one for the jury. Gardner v. Simmons, supra.

■ The trial court in the instant case determined, and we think correctly so, that the evidence presented a jury question as to the defendant's responsibility for Norris' negligent acts at the time of the accident. Certainly there was dispute as to the reasonable inferences to be drawn from the facts. The trial court presented the agency question to the jury upon the following instructions, to which no exceptions were taken:

"The ultimate questions you must decide are whether or not Mr. Norris was acting within the scope and course of his employment with Burger Chef at the time he injured Mr. Govro, and whether or not Norris was negligent, and was his negligence the proximate cause of plaintiff's injuries.

"The test for determining whether or not a particular act was done in the course of a servant's employment, is whether the act was done in the prosecution of the business in which the servant was employed to assist. The act of the servant must be connected with the business of the employer and must be in furtherance of the object for which the servant was employed. In other words, if the act of the serv-

ant is for the direct benefit of the employer, and not solely for some independent purpose of his own, the act is within the general scope of the servant's employment.

"It is the plaintiff's position that when Mr. Norris sought to combine in one trip going to the bank and picking up his lunch, there was some direct benefit to Burger Chef from the doing of both of these things. It is agreed that going to the bank was beneficial to Burger Chef, and the question for you to resolve is whether going on from the bank, in the one trip, to pick up his lunch was also of some direct benefit to his employer.

"Therefore, if you find that there was some direct benefit to Burger Chef in Norris' act of picking up his lunch after he left the bank, then Norris was acting within the scope of his employment on the occasion in question.

"Or, if you find that Norris was authorized by his employer, either directly or impliedly, to pick up his lunch after he left the bank and in the one trip, and that the doing of such was of a direct benefit to his employer, then and in that event you may find that Norris was acting within the scope of his employment.

"When I refer to the act of the servant, I am not, of course, referring to his act of striking and injuring Mr. Govro. The act that I do refer to is the act of Mr. Norris in driving east on Big Bend in order to pick up his lunch. If that act was within the scope of his employment, as I have defined that term for you, then you should determine whether or not Mr. Norris was negligent in the operation of his automobile at the time of the accident.

\*　　\*　　\*　　\*　　\*　　\*

"If you find that Mr. Norris was acting within the scope of his employment, as I have defined and used that term for you, and if you further find that he was negligent in the operation of his automobile at the time he struck and injured Mr. Govro, and that as a direct result of such negligence Mr. Govro sustained damage, then your verdict must be in favor of the plaintiff, Lee J. Govro, and against the defendant, Burger Chef Systems, Inc.

"The defendant Burger Chef takes the position that when Norris failed to go directly from the bank back to Burger Chef and instead drove over to and down Big Bend to get his lunch, he was acting to effect an independent personal purpose of his own which had no direct benefit to his employer. If that is true, Norris was not acting within the scope of his employment, regardless of whether or not he was authorized by his employer to combine his trip to the bank with picking up his lunch.

"If you find that Norris was not acting within the scope of his employment for defendant at the time of the accident in evidence, your verdict must be in favor of defendant Burger Chef Systems, Inc. and against plaintiff Lee J. Govro."

Aside from the fact that the foregoing jury charge went unchallenged, we believe it properly and accurately represents the law of the State of Missouri as enunciated by its Supreme Court.

■■ Missouri holds that if at the time of the occurrence of the accident the employee has departed from his work to fulfill a personal purpose not connected with his employment, then the relationship of master and servant is temporarily suspended and the master is not liable for his servant's acts during such period of suspension. Micelli v. Williams, Mo.App., 1956, 293 S.W.2d 136, 138. Thus, it is the general rule in Missouri that the employment relationship is suspended while the employee is going to and from work or to and from lunch "unless there is some special direct benefit to the master from the use of said car". Stone v. Reed, Mo.App., 1952, 247 S.W.2d 325, 332; Sharp v. W & W Trucking Co., Mo., 1967, 421 S.W.

2d 213, 219; Micelli v. Williams, supra, 293 S.W.2d at 138–139.

■ An exception to the general going to and from lunch rule is the doctrine of dual purpose travel, a trip in which the employee and employer's purposes are combined, the landmark case on which is Marks' Dependents v. Gray, 1929, 251 N.Y. 90, 167 N.E. 181.[2] In that case, a plumber's helper who was traveling to a neighboring town to meet his wife was asked by his employer to fix some faucets there—a trifling job which would not in itself have occasioned the trip. The employee was injured on the way. In denying workmen's compensation, Judge Cardozo announced this formula:

"* * * We do not say that service to the employer must be the sole cause of the journey, but at least it must be a concurrent cause. To establish liability, the inference must be permissible that the trip would have been made though the private errand had been canceled. * * * *The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own.* * * * If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business er-

rand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk." (Emphasis supplied.) 167 N.E. at 183.

The doctrine of dual purpose travel was first approved and applied by the Missouri Supreme Court in O'Dell v. Lost Trail, Inc., 1936, 339 Mo. 1108, 100 S.W.2d 289, and has been applied by the courts of Missouri many times since, both in workmen's compensation and respondeat superior cases.[3]

It is not required that the business purpose be the primary or dominant motive for the trip, but simply that the service of the employer is a concurrent cause of the journey. Wolfe v. Harms, Mo., 1967, 413 S.W.2d 204, 216; Gordon v. Puritan Chemical Co., Mo.App., 1966, 406 S.W.2d 822, 828; Gingell v. Walters Contracting Corp., Mo.App., 1957, 303 S.W.2d 683, 688–689.

■ In the situation where the performance of the employee's personal business occasions a detour from the route required for the performance of his employer's business, then the question becomes whether there was such a deviation from the business route as would constitute an abandonment or stepping aside from the employment. In Speidel v. Kellum, Mo.App., 1960, 340 S.

---

2. Section 236 of the Restatement of Agency recognizes the rule as follows:
"Conduct Actuated by Dual Purpose
"Conduct may be within the scope of employment, although done in part to serve the purposes of the servant or of a third person.
Comment:
"a. * * * The rule stated in this Section * * * includes * * * [the situation] in which the servant, although performing his employer's work, is at the same time accomplishing his own objects or those of a third person which conflict with those of the master. This is true not only as to the act done but as to the manner of doing it.
"b. The fact that the predominant motive of the servant is to benefit him-

self or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act otherwise is within the service, * * *. So also, the act may be found to be in the service if not only the manner of acting but the act itself is done largely for the servant's purposes. * * * *"

3. E. g., Wolfe v. Harms, Mo., 1967, 413 S.W.2d 204, 216; Ares v. Owens, Mo. App., 1966, 407 S.W.2d 33, 35; Sperry v. Tracy Dodge-Plymouth Co., Mo., 1961, 344 S.W.2d 108, 112–113; Foster v. Campbell, 1946, 355 Mo. 399, 196 S.W.2d 147, 150; Hopkins v. J. I. Case Co., Mo., 1956, 293 S.W.2d 402, 406.

W.2d 200, 202, the Kansas City Court of Appeals stated:

"* * * Our courts have taken a firm position in cases arising under the *respondeat superior* doctrine where employees have deviated from the scope and course of their employment. As said in the case of Rainwater v. Wallace, Mo.App., 169 S.W.2d 450, 456, affirmed 351 Mo. 1044, 174 S.W.2d 835:

" 'It is the well established rule in this state, that a servant does not step without the scope of his employment, as a matter of law, by joining some private business of his own with that of his master's, except where he makes a marked deviation from his master's business.' To the same effect are the more recent cases of Brown v. Moore, Mo.Sup., 248 S.W.2d 553, 557, and Beckwith v. Standard Oil Co., Mo.Sup., 281 S.W.2d 852."

In Thomas v. McBride Express Co., Mo. App., 1954, 266 S.W.2d 11, 13, the St. Louis Court of Appeals stated:

"The solution of the problem presented is not merely a matter of measuring the distance, the time, or the direction of the departure from what may be called the path of authorized conduct. Such circumstances may guide the judgment, but will not be suffered to control it aside from other circumstances which may characterize the intent of the transaction.

"A servant may in certain instances deviate from the most direct or authorized route and still be in the master's service. * * * or he might turn aside to attend to necessary personal wants which are considered incidental to his employment. But any turning aside from the designated or customary route, where the sole motive is self interest, unmixed with any intent to serve the master, separates the servant from the master's service, regardless of the extent of the deviation."

In applying the Missouri law in our determination of whether the District Court erred in not deciding the agency issue as a matter of law,[4] we are guided by the language of this court in Thomas v. Slavens, 8 Cir., 1935, 78 F.2d 144, 147, where the question arose under Missouri law as to whether an employee was in the scope of his employment when he deviated from the shortest geographical route in order to get a meal:

"* * * [T]o relieve the master from liability of his servant's acts, on the ground that he has deviated from the scope of his employment, the deviation must be so substantial as to constitute an entire departure from such employment for purposes entirely personal to the servant; and, where the servant, notwithstanding the deviation, is still to some extent engaged in the master's business within the scope of his employment, it is immaterial that he may also have combined with this some private purposes of his own.

"Whether there has been a deviation from the scope of the servant's employment so material or substantial as to constitute a departure therefrom is usually a question of fact to be decided by the jury. Of course, the deviation might be so marked or so slight as to warrant the court in concluding as a matter of law that the act was or was not a departure; but,

4. According to Mull v. Ford Motor Co., 2 Cir., 1966, 368 F.2d 713, 716, footnote 4, the majority of the circuits have held that the federal standard should be applied where the issue is the sufficiency of the evidence required to take the case from the jury. This circuit has left the question open. Schneider v. Chrysler Motors Corp., 8 Cir., 1968, 401 F.2d 549, 554, footnote 5; Jiffy Markets v. Vogel, 8

Cir., 1965, 340 F.2d 495, 498; Hanson v. Ford Motor Co., 8 Cir., 1960, 278 F.2d 586. However, this court has previously determined that there is little, if any, difference between the Missouri and federal standards. Ahmann v. United Air Lines, Inc., 8 Cir., 1963, 313 F.2d 274, 281; Lewis v. Nelson, 8 Cir., 1960, 277 F.2d 207, 210.

*where the deviation is uncertain in extent and degree, or where the surrounding facts and circumstances leave room for legitimate inferences as to whether or not, notwithstanding the deviation, the servant may still be engaged in the master's business within the scope of his general employment, then the question is a jury one, and each case must be determined with a view to its surrounding facts and circumstances."* (Emphasis supplied.)

The Missouri Supreme Court's delineation of these rules for submission of a case to the jury is substantially identical. See, Brown v. Moore, Mo., 1952, 248 S.W.2d 553, 557. Under the facts of this case and the legitimate inferences which could be drawn therefrom, the jury may well have determined, as they undoubtedly did determine, that Norris was on a "circuitous journey", the dual purpose of which was to obtain change for use by the employer and lunch for himself and return to the place of business where the change would be used and he would consume the lunch while he was also giving attention to his employer's business. We are of the opinion that the District Court did not err in submitting to the jury the question of whether Norris was acting in the course and scope of his employment at the time of the accident.

Were we at all in doubt with reference to the law of the State of Missouri on the agency question, we would resolve that doubt in favor of the conclusions of Judge Meredith, a trial judge of ability and experience, thoroughly grounded in the substantive law of the State of Missouri.

## IV.

 Defendant's fourth claimed error concerned the trial court's refusal to give defendant's requested instruction No. 2, which involved the agency issue. It is appropriate to discuss that claimed error following disposition of claimed error No. I, which also encompassed the agency issue.

Defendant asks for a new trial on the ground that the trial court failed to give its requested instruction No. 2 which, in order for the jury to have rendered a verdict for the defendant, would have required a finding that Norris, at the time of the accident, was not

"* * * performing any act to serve the interest of defendant Burger Chef Systems, Inc., and was not, at the time of the collision, at a place where the performance of his work for Burger Chef Systems, Inc., required him to be, * * *."

This requested instruction was based upon Missouri Approved Instruction (MAI) 13.04, which provides:

"13.04. Definition—Agency—Route Deviation

"Acts were within the 'scope and course of employment' as that term is used in this [these] instruction[s] if they were done to serve the [business] [interests] of (name of master) while (name of servant) was at a place where the performance of his work required him to be."

As titled, MAI 13.04 was designed to cover "route deviation" cases. The "Committee's Comment" under the instruction relies principally upon Thomas v. McBride Express Co., supra, Mo.App., 1954, 266 S.W.2d 11, 13, where the St. Louis Court of Appeals held that:

"* * * any turning aside from the designated or customary route, where the sole motive is self interest, unmixed with any intent to serve the master, separates the servant from the master's service, regardless of the extent of the deviation."

As we have noted, this case is not a strict route deviation case. MAI 13.04 was therefore inappropriate and had it been given would have been inaccurate and misleading.

This court stated the governing federal rule in Honebein v. McDonald, 8 Cir., 1962, 299 F.2d 493, 495–496:

"* * * [A]ppellate courts have consistently held that a trial judge may use his own language in giving

instructions to a jury and may not be forced to use the particular verbiage of a requested instruction. * * * If the language used in the instructions adequately, correctly and understandably presents the issues to the jury, then no fault may be found therewith."

See, also, Luther v. Maple, supra, 8 Cir., 1958, 250 F.2d 916, 921. In this case the District Court adequately, correctly and understandably presented the issue of scope of employment to the jury. We find no error in the trial court's refusal to give defendant's requested instruction. Cf., Smith v. Wire Rope Corporation of America, Inc., 8 Cir., 1967, 383 F.2d 186, 188.

## II.

 Plaintiff's witness Robert E. Hudson testified that he had arrived at the scene of the accident "within a minute or two" thereafter and that Norris told him that he was "going after meat". The statement would carry the implication that at the time of the accident Norris was directly serving Burger Chef by going after meat to replenish the restaurant's supply. The testimony was objected to by defendant's counsel on the basis that it was hearsay, plaintiff's counsel urged that the statement was within the res gestae exception to the hearsay rule, and the court overruled the objection. Defendant now contends on appeal that the District Court's admission of the statement constituted reversible error. We are not so persuaded.

Initially, we note that Rule 43(a), Federal Rules of Civil Procedure, 28 U. S.C.A., provides:

"* * * All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United

States court is held. In any case, the statute or rule which favors the reception of the evidence governs * * *."

See Roth v. Swanson, 8 Cir., 1944, 145 F.2d 262, 269. The discretion of the trial court in the admission of evidence, when exercised within normal limits, should not be disturbed on appeal. Brigham Young University v. Lillywhite, 10 Cir., 1941, 118 F.2d 836, 137 A.L.R. 598, cert. denied, 1941, 314 U.S. 638, 62 S.Ct. 73, 86 L.Ed. 512. See, also, Roberts v. United States, 8 Cir., 1964, 332 F.2d 892, 898, cert. denied, 1965, 380 U.S. 980, 85 S.Ct. 1344, 14 L. Ed.2d 274; Chicago, G. W. R. Co. v. Robinson, 8 Cir., 1939, 101 F.2d 994, 997, cert. denied, 1939, 307 U.S. 640, 59 S.Ct. 1038, 83 L.Ed. 1520; State ex rel. State Highway Commission v. Cone, Mo., 1960, 338 S.W.2d 22; Faught v. Washam, Mo., 1959, 329 S.W.2d 588.

The test for the admissibility of statements under the res gestae exception to the hearsay rule is whether it is a spontaneous utterance produced by the event itself. See, e. g., Sconce v. Jones, 1938, 343 Mo. 362, 121 S.W.2d 777, 781; Gough v. General Box Co., Mo., 1957, 302 S.W.2d 884, 889; Straughan v. Asher, Mo.App., 1963, 372 S.W.2d 489, 495–496; VI Wigmore, Evidence, 3d ed., § 1747.

We find here that the plaintiff made a sufficient showing of the statement's spontaneity and that the trial judge did not abuse his discretion in admitting the statement into evidence. (Here the evidence is that while Norris was not knocked unconscious, he was injured and was taken to a hospital where a cut in his head was sutured.) Furthermore, we are of the opinion that even if Norris' utterance had been erroneously admitted, it could not have materially affected the merits of the action such as to require reversal. See Rousch v. Alkire Truck Lines, Inc., Mo., 1957, 299 S. W.2d 518, 522. Although the jury could have inferred from the statement that Norris was going after meat for Burger Chef at the time of the accident, such an inference would have been unreasonable

because after the admission of the statement no further reference was made thereto during the entire case and both counsel rested their cases on the premise that Norris was going to the Kentucky Fried Chicken place for the purpose of obtaining his own lunch and taking it back to Burger Chef. The court's instructions to the jury stated specifically that it was "agreed" that after Norris went to the bank he "headed east on Big Bend, intending to stop at the Kentucky Fried Chicken place mentioned in evidence and there pick up his lunch and take it back to the Watson Burger Chef to eat". Furthermore, throughout the court's charge reference was repeatedly made to the fact that Norris was making the trip to Kentucky Fried Chicken solely to pick up his lunch. If there was error, it was certainly error without prejudice.

### III.

Defendant claims to have been

"* * * prejudiced by the cumulative effect of errors committed by the District Court in admitting evidence pertaining to the claim of injury which was calculated to arouse passion and prejudice, and in permitting inflammatory and prejudicial argument by [plaintiff's] counsel."

It is claimed in defendant's behalf that:

"The totality of errors requires a reversal of the judgment, regardless of whether or not each error, individually considered, would or would not require reversal."

It is argued that:

"The prejudicial effect of the errors discussed herein is reflected in the large verdict returned against [defendant] in this case—$150,000.00."

The errors claimed by the defendant include the admission of testimony that at the scene of the accident plaintiff repeatedly requested a priest and the "Last Sacraments", and asked whether his legs were still there; the admission of three (of four) uncolored photographs taken by members of the police department during their investigation immediately after the accident, one or more of which photographs showed dark spots on the pavement identified as plaintiff's blood; the admission of photographs of the lower portion of plaintiff's partially clothed body showing fully the long leg brace on his right leg; and what defendant terms prejudicial and inflammatory argument by plaintiff's counsel as follows:

"Now I get to the point that I think is going to be the most solemn duty, perhaps, you have ever performed in your whole lives. That will be to render justice and make a just award, just to Burger Chef and just to Govro, for what they did to him.

"Mr. Buckley, I am sure, will try on the subterfuge that he went north or south instead of straight back.

"Mr. Buckley: I object to the term subterfuge as a personal attack. I don't think that is fair.

"Mr. Rosecan: I didn't mean subterfuge as you think of it, I was thinking differently. But based on whatever argument, he will want you to take Govro and turn him out without a dime, and just let him go on to some human scrap heap.

"Mr. Buckley: I object to the term scrap heap as prejudicial. I object to that, it is not fair and it is prejudicial to the defendant in this case.

"The Court: The jury realizes that anything the lawyers say is not evidence. It is merely their personal opinion about what ought to be. The jury will be bound by the evidence which has been admitted into court, which they have heard, and by the charge of this Court.

"Now, proceed, gentlemen.

"Mr. Rosecan: I wonder where else does a man go who can't use his legs, and whose employability is practically nil. Who can't earn a livelihood. Where else does he go except on a human scrap heap?

"Mr. Buckley: I repeat my objection. May I make a record, please?

"The Court: Yes."

Thereupon, defendant's counsel moved for a mistrial. His second objection was overruled and the mistrial denied.

In addition to the foregoing, defendant also objected to plaintiff's counsel making suggestions, such as the following, as to how much plaintiff should receive at the jurors' hands:

"Mr. Rosecan: * * * For the two years in the hospital, you can figure that. I took an arbitrary figure, you may think I am high. You may think I am low. I thought to spend two years in a hospital, I thought a thousand dollars a month—

"Mr. Buckley: I am going to object to that, Your Honor. That per unit argument is improper and prejudicial. There is nothing in the evidence to warrant such an argument, per unit cost for any particular thing, and I object to it. There is nothing to warrant a per unit assessment.

"Mr. Rosecan: This is not a per unit assessment. We have some basis. This is what you asked for.⁵ If you think I am high you may argue to the jury.

"Mr. Buckley: I am objecting to the Court.

"The Court: Overruled.

"Proceed.

```
* * * * * *
```

"Mr. Rosecan: * * * Another way you might approach it is, if you are earning $10,000 a year and somebody came to you and said, 'Look, I will triple your wages.'

"Mr. Buckley: I am going to object—

"Mr. Rosecan: 'You can earn thirty thousand.'

"Mr. Buckley: I am going to object to this argument as asking the jury to place themselves in the position of the injured person. I am going to object to that as improper.

"The Court: The jury understands. They are going to make this determination based on the facts and the evidence and the charge of the Court, and what they believe the damages are to Mr. Govro.

"Mr. Buckley: I further object that this is a job offer argument and it is improper and prejudicial and has been so held.

"The Court: Proceed, gentlemen.

"Mr. Rosecan: If someone would come to me and say, 'Look, Rosecan, if you are making $10,000 a year, I will triple it. But you must have Lee Govro's legs.' I guess the only one that could come to me with such a proposition would be the devil himself. I think any sane person would say, 'I don't want that extra $20,000. I want my legs.' And if you are making $25,000 a year, and the devil came and said, 'We will give you $75,000, but you must have Lee Govro's legs. And you must suffer as he has suffered.' Wouldn't any sane person say, 'No, no, I would rather get by on what I have. I don't want that extra $50,000.' And so, if you wanted to, you can say, if we gave him enough for $20,000 a year, he isn't going to live in the lap of luxury. * * *"

---

5. As plaintiff's counsel neared the end of his opening argument to the jury, defendant's counsel interrupted as follows:

"Mr. Buckley: Your Honor, May I ask some advice?

"(Thereupon, the following occurred at the bench out of the hearing of the jury:)

"Mr. Buckley: Your Honor, in the first half of Mr. Rosecan's argument he had not asked this jury for any particular sum of money. Therefore,

I have no opportunity in my argument to refute anything on that general subject. I am going to object to the remainder of his argument to his mentioning any particular sum of money, because I won't have an opportunity to refute it. And I bring this to Mr. Rosecan's attention at this moment so that if he desires to do that he can do it now.

"Mr. Rosecan: I will. I am going to.

"The Court: All right."

We first consider seriatim the alleged errors, the totality of which defendant claims requires a reversal. The testimony as to what the plaintiff said while lying on the ground immediately after the accident, in shock and pain, was probably unnecessary but certainly such admission was not prejudicial error such as to require reversal. We see no reason whatsoever why the photographs referred to, and which we have examined, should not have been admitted for the jury's consideration. They had both purpose and materiality. It must be remembered that at the time the photographs were offered and received in evidence the defendant was contesting the allegation of primary negligence on the part of Norris, so that it was indeed material and necessary for the jurors to know just where the plaintiff was standing at the time he was struck by the Norris automobile. The blood spots on the pavement clearly indicated where the plaintiff fell. The photographs of the two vehicles showing where they came to rest after the collision were material and helpful to the jurors in determining the negligence issue. The photographs of plaintiff and his braces were certainly pertinent to the damage issue and made it unnecessary for him to undress before the jury. Counsel's reference to "some human scrap heap" was obviously made for the purpose of impressing the jurors and was an improper appeal to them for sympathy for the plaintiff. We believe, however, that the able trial judge's statement to the jury had a curative effect and his refusal to grant a mistrial was certainly not an abuse of discretion. In the same category we consider the argument of plaintiff's counsel regarding the amount of recovery. Judge Meredith's final instructions to the jury took careful note of the fact that the opening statements and closing arguments of the attorneys were not evidence and that the jurors were not to be influenced in any degree by any personal feeling of sympathy for or prejudice against any party to the suit. In reading and examining this substantial record in detail, we are impressed with the fact that Judge Meredith was a careful moderator and had complete control of this somewhat difficult lawsuit, where his patience might well have been taxed by interruptions of both counsel and argumentative objections on trivial matters and where counsel in their zeal may have said and done things which should well have been avoided.

Defendant does not claim the ground of excessiveness of the verdict as an independent reason for a new trial, but does contend that the judgment might be reversed because under these peculiar circumstances—that is, the totality of the alleged errors under point III—the verdict became excessive.

This court has consistently and for many years refused to review a judgment on the claimed ground of excessiveness. As stated by Chief Judge Gardner in Missouri-K. T. R. Co. of Texas v. Ridgway, 8 Cir., 1951, 191 F.2d 363, 367, 29 A.L.R. 984:

"* * * [I]n a tort action the excessiveness of the verdict is a question to be submitted to the trial judge on motion for new trial and can not be considered as a ground for reversal by this court."

When we have granted review, it has been

"* * * only in those rare situations where we are pressed to conclude that there is 'plain injustice' or a 'monstrous' or 'shocking' result." Solomon Dehydrating Co., Inc. v. Guyton, 8 Cir., 1961, 294 F.2d 439, 443, cert. denied, 1961, 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192.

See, also, Honebein v. McDonald, 8 Cir., 1962, 299 F.2d 493, 496. So limited, and considering all of the many claimed errors and their totality, our review of the complete record certainly does not justify the conclusion that the amount of the verdict here is plainly unjust, monstrous or shocking. Plaintiff spent two solid years in hospitals, during which time he underwent four or five surgical proce-

**934**

dures. He is seriously and permanently crippled in his lower extremities. He cannot bend his knees. To get about at all he must wear a leg brace and is only able to walk short distances with the aid of crutches. He may some day be recovered to the point where he can discard the crutches and use two canes or possibly only one. He can no longer perform the work required by his prior occupation as a salesman but must find something to do which does not require moving about. His medical and hospital expenses up to the time of the trial totaled over $26,000. During the two years of hospitalization his lost wages totaled over $13,000. He will undoubtedly continue to have further medical expenses. Pain and disability will continue through life. Under the circumstances we see no reason to categorize the verdict as "excessive per se".

We are of the opinion that the trial was completely fair, that no prejudicial errors were committed, and that the judgment should be and is

Affirmed.